

# NUMBER 13-21-00397-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**KRISTINA DANIELLE LARA,**                                        **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                              **Appellee.**

### On appeal from the 156th District Court
### of Live Oak County, Texas.

# MEMORANDUM OPINION

### Before Justices Benavides, Hinojosa, and Silva
### Memorandum Opinion by Justice Hinojosa

This is an appeal from a motion to revoke community supervision. By two issues, appellant Kristina Danielle Lara argues that: (1) the trial court abused its discretion in finding that Lara violated a term of her community supervision; and (2) the trial court erred in ordering consecutive sentences. We affirm as modified.

## I. BACKGROUND

## A.  Procedural Background

On May 12, 2020, Lara was charged in a five-count indictment: count one was for stalking; count two was for tampering with a witness; count three was for online harassment; count four was for unlawful disclosure of intimate visual material; and count five was for retaliation. *See* TEX. PENAL CODE ANN. §§ 21.16; 33.07(c); 36.06(c); 36.05(d), 42.072(b). All the counts were third-degree felonies except for count four, which was a state jail felony. Lara entered guilty pleas on all five counts on January 25, 2021. The trial court placed Lara on deferred adjudication community supervision for ten years for counts one, two, three, and five. On count four, Lara received a state jail sentence of 351 days. Lara was released from jail in March 2021.[1]

On November 1, 2021, the State filed motions to adjudicate each probated plea. The motions alleged that Lara committed multiple violations of two specific conditions of her community supervision: (1) to not commit or be convicted of any offense against the laws of the state of Texas, any other state, or the United States; and (2) to not contact or communicate directly or indirectly with the complainant or complainants in her case by any means, including written, internet telecommunication, or third-party communication. Specifically, the motions alleged the following:

> 1. On or about the 12th day of October, 2021, in the County of Bee, State of Texas, the said [Lara], did then and there, and pursuant to the same scheme and course of conduct that was directed specifically at James Robert Haley, hereafter styled the complainant, knowingly engage in conduct directed specifically toward the complainant that the defendant knew or reasonably should have known that the complainant would regard as threatening bodily injury

---

[1] It appears Lara was given credit for time-served.

to a member of the family or household of the complainant and the defendant's conduct would cause a reasonable person to feel harassed.

2.    On or about the 12th day of October, 2021, in the County of Bee, State of Texas, the said [Lara], did then and there, with intent to harass, annoy, alarm, abuse, torment or embarrass James Robert Haley, hereafter styled the complainant, make repeated telephone communications anonymously to the complainant.

3.    On or about the 17th day of March, 2021, in the County of Live Oak, State of Texas, the said [Lara], did then and there, with intent to harass, annoy, alarm, abuse, torment or embarrass Brandon Lee Oxford, hereafter styled the complainant, make repeated telephone communications anonymously to the complainant.

4.    On or about the 17th day of March, 2021, in the County of Live Oak, State of Texas, the said [Lara], then and there have contact with the victim in this cause to wit: on March 17, 2021, the defendant, [Lara] did communicate with the victim, Brandon Lee Oxford, to wit: telecommunications (Text Messaging), in violation of Conditions of Community Supervision in Live Oak County Cause Number LCR200030CT1 styled the State of Texas vs. [Lara].

## B.    Hearing on Motion to Revoke

The trial court held a hearing on the motion to revoke on November 8, 2021. The following witnesses testified.

### 1.  Brandon Oxford

Oxford testified that he met Lara on Facebook nine years prior but knew her as "Taylor Kelly." Oxford explained that Lara "catfished" him, or used a false name and pictures online, for five years until Lara revealed her actual identity. Oxford explained that he decided to continue their friendship even after he learned that Lara had been deceitful. The couple eventually met in person and began a romantic relationship. When Oxford ended the relationship, however, he stated that he began to receive "harass[ing] calls,

texts, lots of stuff" from Lara. He reported this behavior to the Live Oak County Sheriff's Department in 2019 and spoke to Deputy Daniel Lee Caddell.

Lara was arrested and charged with five offenses. As noted earlier, she pleaded guilty to all charges, received deferred adjudication for four offenses, and served time for the fifth offense. While she was incarcerated, Oxford testified he did not receive any kind of harassing communication. However, when Lara was released in March 2021, he began receiving threatening communications again. Oxford stated that the communications were from different anonymous numbers used through an app. One text stated, "You will never understand the damage you did to someone until the same thing is done to you. That's why I am here. Karma." Another text stated, "Revenge sounds so mean. That's why I prefer calling it returning the favor." A third text set forth, "What doesn't kill me is going to give me time to recover, and then you're f–cked." Other text messages stated, "Coming for ya. Ya won't know when or where. I can see ya in a store or even ya home. Watch ya back and now I'm coming," and "Scared to pick up. Ya nightmare is just beginning." Oxford testified that he "was getting multiple calls, texts, every—every few seconds, every few minutes" for every day in March of 2021. He stated that he answered some of the calls and there "was either the radio playing or there was absolute silence." On one voicemail, though, he heard "a woman talking to a man." Oxford stated he recognized both voices—it was Lara speaking to her father.

Oxford testified that he owns his own business that he advertises on Facebook. He received an email inquiry that asked for his personal phone number that made him suspicious. He suspected the email was from Lara because "[s]he always used 'K' or

Cowgirl or Ranchy or something in all of her emails," and this email was from "K Cowgirl." He received another email from cojo0013@yahoo.com, and he believed "without a doubt" that it was from Lara because she was a fan of country music artist Cody Johnson. The email stated, "Can you really have that much hate in you that you have got to destroy [some]one's life?"

Oxford has a current girlfriend, Mandy Bryan. He stated that Bryan has not received any harassing communications but her twenty-year-old daughter Faith Townsend has. The text messages Townsend received speak ill of Oxford and call Bryan names. One text stated, "His ex is NEVER gonna go away[.] [S]he's gonna make sure [h]is life is a living hell as well as your mamma and she has the power to and he knows it. She can expose him at anytime so tell your f–cking mom to watch it."

### 2. Dustin Umphres

Dustin Umphres is Oxford's best friend of sixteen years. He stated that he began to receive text messages about Oxford from unknown numbers. He testified that at one point he began to respond to these anonymous texts. When the texts began verbally abusing his wife and children, he told the respondent, "I know who you are"—having "no doubt" the sender was Lara. He testified that the sender then tried to respond more civilly. The sender sent Umphres pictures of Lara and Oxford from the time they were together, texting, "The [sic] way you know the relationship wasn't a lie." Umphres acknowledged that the sender never admitted she was Lara.

### 3. James Robert Haley

James Robert Haley met Lara on Tinder, a dating app, in the summer of 2021.

Haley stated that he made it clear to Lara that he was not looking for a long-term relationship as he was only separated and not divorced from his wife. He testified he broke things off when Lara declared she had feelings for him. At that point, Lara told Haley that she was pregnant. She sent Haley pictures of a positive pregnancy test and a sonogram from a patient named "Kristina Daniels."

Haley testified that he and Lara agreed she should terminate her pregnancy. He testified that Lara sent him pictures from the hospital with "IVs in her arm" as proof she had an abortion. Haley continued to talk to Lara but maintained some distance. Haley testified that he then received a communication from "a third-party-fake account," notifying him that "the abortion was not a real abortion, that [Lara] was still pregnant." The fake account was from the Facebook account of "Kylee James." Haley asked Lara if she knew James but Lara denied it.

James began to threaten Haley. Haley testified the messages said, "[t]hat she would find me. [That] I am not safe anywhere I go. My ex-wife is not safe wherever she goes. My kid should suffocate and die like I wanted [Lara's] baby to suffocate and die." He testified that he asked James to stop sending these messages and became fearful for his child and ex-wife. He recalled:

> There were just lots of threats. There were descriptions of my house, my dogs, that there would be salts or sugar in my gas tank and nails in my tires, that I should watch for things like—we had my daughter's soccer game. She would then comment, "You guys look like you're really a happy family at your daughter's soccer game," which is very alarming to know where and when we were somewhere.

Haley's ex-wife, coincidentally, worked with Oxford's sister Sherry Oxford. The two families realized that they were both experiencing similar harassment. Sherry had some

6

of the text messages sent to her brother Oxford. Haley then realized that both he and Oxford had received harassing messages from the same phone number. He subsequently filed harassment charges at the Beeville Police Department against "Kylee James." When he filed those charges, he learned that similar charges had been placed against him by Lara.

Haley testified that Lara later admitted to him that she was James.

### 4. Deputy Daniel Lee Caddell

Deputy Daniel Lee Caddell, an investigator with the Live Oak Sheriff's Department, testified that he was assigned to the series of cases involving Lara. Deputy Caddell stated that he investigated the harassing messages sent to Oxford, Haley, Umphres, and Nicole Kacsir, Oxford's ex-wife. He testified:

> It was all similar; using the fake apps, the apps that get the fake phone numbers, text messages. Getting emails, social media like Facebook where she impersonates another person, tries to make contact with victims and family members, children, ex-wife, friends. So she has a whole series of impersonating different people on social media.

Based on his investigation, Deputy Caddell concluded that Lara was the sender of these messages. He testified that one number sent threatening messages to Oxford, Umphres, and Haley. Deputy Caddell acknowledged, however, that none of these numbers or messages were traced to Lara specifically.

### 5. Lara

Lara denied sending any messages to the complainants or their loved ones after she was released from jail in March 2021. She stated that she was on deferred adjudication community supervision for this type of act and knew that her community

7

supervision could get revoked. She testified that she filed harassment charges against Haley because she was receiving threatening text messages that he was coming to her house after he learned she was still pregnant. She relayed to the court that she eventually miscarried Haley's child. Lara also denied that she had a fake Facebook account under the name of Kylee James, or that she ever admitted to being Kylee James. She did, though, admit that she began her relationship with Oxford through a fake Facebook account: "I met him through a fake profile. We talked for maybe two, three years, but I came clean. He found out who I was, and he decided on his own to stay with me."

## C. Adjudication and Sentencing

The trial court found the first, second, and third violations true by a preponderance of the evidence and found the fourth violation not true. The trial court then revoked Lara's deferred adjudication community supervision. On counts one, two, and three, the trial court ordered ten years' incarceration at the Texas Department of Criminal Justice—Institutional Division. It also ordered ten years' imprisonment for count five. It ordered counts one, two, and three to run concurrently, and then ordered the punishment for count five to run consecutively to counts one through three.

Lara appeals.

## II. VIOLATION OF COMMUNITY SUPERVISION TERM

By her first issue, Lara argues the trial court abused its discretion by finding that Lara violated a term or condition of her community supervision.

## A. Standard of Review & Applicable Law

We review an order revoking community supervision under an abuse of discretion

8

standard. *Bryant v. State*, 391 S.W.3d 86, 93 (Tex. Crim. App. 2012); *Rickels v. State*, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006). An abuse of discretion occurs only when the decision was so clearly wrong as to lie outside that zone within which reasonable persons might disagree. *State v. Lerma*, 639 S.W.3d 63, 68 (Tex. Crim. App. 2021).

A revocation hearing is not a criminal prosecution, and the degree of proof required to establish the truth of the allegation in a motion to adjudicate guilt and revoke community supervision is not the same. *Hacker v. State*, 389 S.W.3d 860, 864–65 (Tex. Crim. App. 2013). "In determining questions regarding sufficiency of the evidence in probation revocation cases, the burden of proof is by a preponderance of the evidence." *Rickels*, 202 S.W.3d at 763. This standard is met when the greater weight of the credible evidence creates a reasonable belief that the defendant has violated a condition of his probation. *Id*. at 763–64 (citing *Scamardo v. State*, 517 S.W.2d 293, 298 (Tex. Crim. App. 1974)).

Proof by a preponderance of the evidence as to any one of the alleged violations is sufficient to support a trial court's decision to revoke community supervision. *See Garcia v. State*, 387 S.W.3d 20, 26 (Tex. Crim. App. 2012). Thus, to prevail on appeal, an appellant must successfully challenge all the findings that support the revocation order. See *Jones v. State*, 571 S.W.2d 191, 193–94 (Tex. Crim. App. [Panel Op.] 1978). "In a probation revocation proceeding the trial court is the sole trier of facts, credibility of witnesses and weight to be given to testimony." *Taylor v. State*, 604 S.W.2d 175, 179 (Tex. Crim. App. 1980).

**B.    Analysis**

Because only one alleged violation is necessary to support a trial court's decision

to revoke, we focus on the State's first allegation: that Lara engaged in conduct directed toward Haley that she knew or reasonably should have known that Haley would regard as threatening to him or to a member of his household. *See Moore v. State*, 605 S.W.2d 924, 926 (Tex. Crim. App. 1980).

Haley testified that Lara admitted to him that she was Kylee James on Facebook. Haley summarized the messages that James sent him: "[t]hat she would find me. [That] I am not safe anywhere I go. My ex-wife is not safe wherever she goes. My kid should suffocate and die like I wanted [Lara's] baby to suffocate and die." He further stated that the messages described his home, warned of putting foreign substances in his vehicle's gas tank or nails in his vehicle tires, and mentioned his child and estranged wife. He admitted to feeling harassed, and to being frightened for his estranged wife and their child.

Although Lara denied creating a fictitious Facebook profile to harass Haley, she did admit to previously making a fictitious Facebook account to "catfish" Oxford. She also acknowledged that she had previously pleaded guilty to similar behavior: she was on deferred community supervision for stalking, tampering with a witness, online harassment, and retaliation, and had served time for unlawful disclosure of intimate visual material. *See* TEX. PENAL CODE ANN. §§ 21.16; 33.07(c); 36.06(c); 36.05(d), 42.072(b). Deputy Caddell testified that, based on his investigation, Lara was the one harassing Haley online.

We conclude that the trial court did not abuse its discretion when it found that allegation number one was "true." The trial court appeared to believe Haley and Deputy Caddell's testimony and disbelieve Lara's, and it is not within our province to disturb this

10

evaluation of evidence. *See Taylor*, 604 S.W.2d at 179. The greater weight of the credible evidence could have created a reasonable belief that Lara violated a condition of her probation. *Rickels*, 202 S.W.3d at 763; *Scamardo,* 517 S.W.2d at 298. We overrule this issue.

## III. CONSECUTIVE SENTENCES

By her second issue, Lara argues the trial court erred in ordering her sentence for count five to run consecutively after she served her sentence for counts one, two, and three. She contends that because her alleged offenses were prosecuted "in the same continuing criminal course of conduct, namely sending harassing and threatening communications" to Haley, that her sentences should run concurrently, not consecutively.

A trial court's decision to cumulate sentences is reviewed for abuse of discretion. *See* TEX. CODE CRIM. PROC. ANN. art. 42.08(a); *Byrd v. State*, 499 S.W.3d 443, 446 (Tex. Crim. App. 2016). "A trial court abuses its discretion if it imposes consecutive sentences where the law requires concurrent sentences." *Byrd*, 499 S.W.3d at 446–47. A claim for improper cumulation may be raised for the first time on appeal and is subject to reformation. *Ex parte Carter*, 521 S.W.3d 344, 347 (Tex. Crim. App. 2017).

Texas Penal Code § 3.03(a) provides that "[w]hen the accused is found guilty of more than one offense arising out of the same criminal episode prosecuted in a single criminal action, a sentence for each offense for which he has been found guilty shall be pronounced. Except as provided by Subsection (b), the sentences shall run concurrently. *See* TEX. PENAL CODE ANN. § 3.03(a). The State, in its brief, concedes that "all five counts were prosecuted in the same criminal action" and that "[n]o such exception [in subsection

11

(b)] applies here." The State therefore agrees that the judgments should be "reformed to reflect that all of the four sentences are to be concurrent[]."

Because the acts Lara committed arose from the same criminal episode, and the State admits as much, we hold the trial court abused its discretion in ordering consecutive sentences when the violations were prosecuted in the same action. *See* TEX. CODE CRIM. PROC. ANN. art. 42.08(a). We sustain this issue and modify the judgment to reflect that the sentences should all run concurrently.

## IV.    CONCLUSION

We modify the trial court's judgments to reflect that all sentences should run concurrently (not consecutively), and affirm the judgments as modified.


LETICIA HINOJOSA
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed on the
28th day of July, 2022.